<div style="margin-left: note">
CALEDONIA,
March,
1840.

Kittridge
v.
Rollins, et al.
</div>

It will, nevertheless, always be readily determined whether the principal object of the suit and the main controversy is in regard to the value and right of property, or in regard to the conduct of the defendant in taking the property, and his treatment of the plaintiff. As a motion of this kind is always addressed to the discretion of the county court, in a case admitting of any possible doubt in regard to the extent of damages, they should not dismiss the suit. Under this restriction we think the rule a safe and necessary one in practice.

Judgment affirmed.

Collamer, J., dissenting.

HARVEY C. GILMAN, *by his next friend, v.* JAMES MORSE.

The statute of 1837, "for regulating and governing the militia," did not disband the militia of the state. Its existing organization continued until it was reorganized under that law. Fines and penalties, accruing for delinquencies under the new law, are to be enforced according to its provisions.

The courts-martial, organized under the new law, have jurisdiction of the delinquencies under that law, though not organized until after the offence.

THIS was an action of trespass, commenced before a justice of the peace against the defendant, who was a colonel commandant and senior officer of the court martial of the 16th regiment, 2d brigade, and 4th division of the militia of this state, to recover for four and five-eighths yards of cloth belonging to the plaintiff, worth five dollars, which was taken by one Asa C. Lee, quarter master sergeant of said regiment, by virtue of an execution signed by defendant.

The plaintiff recovered judgment before the justice, and the case was appealed to the county court, and came up to this court upon the following case stated, to wit:

" John A. Gilman, the plaintiff, was eighteen years of age, " and had resided in St. Johnsbury six months previous to " the first Tuesday in June, 1838 ; the said John was en-" rolled and warned to appear on the parade ground in St. " Johnsbury, armed and equipped according to law, on the " first Tuesday of June, 1838, and to put himself under the " command of Calvin J. Wright, captain of the standing " company of St. Johnsbury, for military discipline and " inspection of arms, but that the said John took no further " notice of said requirement, nor did the said John at any " time thereafter, appear before said captain, and make an " excuse for not appearing on said parade. It is further " admitted, that afterwards a return of the delinquency of " the said John by the said Wright, was made, together " with the amercement, to the court martial according to " law as prescribed by the act of 1837, and that notice was " properly given to the said John by the said Wright, to " appear before a court martial then next to be holden at " said St. Johnsbury, on the 17th day of November, 1838, " which court martial was regularly holden on said day, at " which time and place, the said John not appearing, and " no cause shewn wherefore said amercement should be " remitted, judgment was rendered thereon, upon which " judgment the execution aforesaid, properly as to form, " issued. It is further admitted, that the commissioners " appointed by the governor to organize the militia of the " state, did not organize the militia of the 16th regiment until " the 7th day of July, 1838. Now, if the said Morse had " a legal right to issue the execution aforesaid, and the said " John was bound to appear on the first Tuesday of June, " 1838, at the command of captain Wright, then judgment " is to be rendered for the defendant to recover his costs ; " but if the said Morse had no such right, then judgment is " to be entered for the plaintiff to recover his damages and " costs adjudged to him in the justice court, and his further " taxable costs in this and the county court."

*E. Paddock and C. Davis,* for plaintiff.

The act, passed 1st November, 1837, for regulating and governing the militia of the state, chap. 15, 17th sec. repeals all former laws for regulating and governing the militia of the state. The first section of the second chapter directs the method of re-organization, requiring the Governor forthwith to appoint a board of officers, consisting of not more than five, nor less than three, to organize the militia of the state into *divisions, brigades, regiments, battalions and companies,* and make returns of their doings to the Governor on or before the first day of May, A. D. 1838.

From some cause, not now necessary to be enquired into, the organization in this county did not take place until the 1st of July, 1838, and it is contended by the plaintiff that between the 1st day of January and 17th of July, 1838, though all officers held their commissions, yet they knew not who their soldiers were to be, neither knew the soldiers their officers; for the number of men required to form regiments and companies was to be increased, so that but little more than half the officers would be retained in command; and who those would be, could not be known, and how regiments and companies were to be united or divided was equally uncertain.

It is contended by the defendant that the old organization, having been once made, would continue until the new one was completed, though the laws directing such organization were repealed; and, as an evidence that the legislature so intended it, we are referred to the 14th section and its proviso, in the 15th chapter. It will readily be seen that the companies here spoken of are independent, voluntarily associated, who can disband or retain their association themselves at pleasure; and the fact that provision is made for those companies retaining their organization, justifies and establishes the conclusion that all other companies were by the repeal disbanded. That the legislature intended no such thing as continuing the old organization, may be inferred from the proviso to the 3d section of the law of 1818, which declares " that the old organization shall continue, until the Governor shall otherwise order." That they intended no such thing is apparent from the proviso to the 17th section, in the 15th chapter, which says, " all fines and forfeitures *which*

*have already accrued,* shall and may be recovered in the manner pointed out by said laws, (of 1818) or in the manner pointed out by this act." If fines and forfeitures could have accrued under the old law, after the new one came into force, on the 1st of January, 1838, why should the proviso have been limited to " all fines and forfeitures which had already accrued," for, by it, all fines and forfeitures, which had not then accrued, or should be supposed to accrue under the old law, (if such a case were supposable) were not collectable either by the old or the new law. The construction contended for by the defendant leads to this absurdity; that while the law is left in force to impose *fines and forfeiures, it repeals all authority for levying them.* What was the object of the proviso? Manifestly to keep so much of the old law in force as was necessary in order to collect the fines and forfeitures which had arisen under it; also, to bring the new law to operate upon an old offence; and the insertion of the proviso authorizes us to say that without it, such fines and forfeitures could not have been collected. Will it be answered that this fine was collected by virtue of the new law? This was " putting a new piece into an old garment," truly. By what authority was the new law used to collect a fine accruing under the old? Not by force of the proviso, for that is limited to those which had accrued before its passage. The new law then could not be used to collect any other fines, except such as were named in the proviso, or such as accrued under the operation of its own provisions; and it could not come into force until the new organization was had; for, until then, there was nothing for it to operate upon.

But it is insisted that the legislature did not intend to leave the militia without an organization. But supposing it did not, and that they intended a re-organization should have been made by the first of January, when all the laws took effect, or by the first of May, when the commissioners ought to have made their returns to the Governor; yet such organization was delayed, contrary to the intention of the legislature and the argument that the legislature *did not intend* to leave the militia unorganized is unavailing since the fact is otherwise.

That the militia can have an organization independent of

the law authorizing and directing such organization, so that the repeal of the law shall not affect such organization, is something which we cannot comprehend. If this be so, then the first organization of any corps is unchangeably to remain. Such notions are altogether repugnant to common sense.

The constitution of the U. S. expressly reserves to the states " the appointment and the authority of training the militia," (p. 27.) And the constitution of this state declares that the militia "shall be trained under such regulation and restrictions, as congress, agreeably to the constitution, of the U. S. and the legislature of this state, shall direct." (p. 44.) The militia system then is not a part of the constitution of this state nor of the U. S. but is a superstructure based upon a positive enactment of our legislature. It follows, then, that if you take away the enactment the superstructure falls; but it may be, and has in this case been, reared again, but upon another enactment.

What would be the effect upon the army of the U. S. were the law under which it was raised and organized, repealed ? Would it not disband the soldiers ? And though the officers might retain their commissions, could they legally punish a soldier for either leaving the ranks or the camp ? We think not.

And if by the same act of congress, a new organization should be ordered, when would that organization take effect, so as to give a particular officer the control of a particular soldier ? At and from the passing of the law, or from and after the detailing the soldiers, and assignment of the several officers over them ?

Again, were this state, by a legislative act, to order the raising, officering, and drilling a corps of 10,000 men for internal defence ; and after the danger had passed away, should repeal the law ; must we always have a standing army quartered upon us, or would the repeal of the law disband the soldiers ?

It would be a palpable violation of the constitution were the court to decide that the delay of the board to reorganize the militia within the time contemplated by the act, would continue in force the old law until the organization should be completed, for inasmuch as the act contemplates no such

thing, it would manifestly be exercising the powers of the legislative department, chapter 2, section 6.

2. If we are mistaken in considering that the repeal of the law of 1818, disorganized and disbanded the militia, yet we do not readily see the distinction between this and a case where a penalty is sued for, after the law imposing it is repealed. There can be no difference, in the effect, between the repeal of a general law, and its expiring by its own limitation. Either case produces the same effect. The repeal of a penal statute without providing for the collection of the fines and penalties which accrued under it, quiets all prosecutions for the recovery of them afterwards. And if the charter of Burlington College had expired, no further rent could be collected upon its leases. Neither can notes given to a banking corporation be collected after its charter has expired. And if our legislature should repeal all laws relating to and governing the state prison, any one would be liable in damages, who should restrain its inmates of their liberty. A charter of a turnpike is about to expire; the legislature grant a new one to the present corporation, with this provision : " that the Governor shall appoint a board of commissioners, whose duty it shall be to inspect the road, and affix a tariff or rate of toll which it shall be lawful for the corporation to tax and require of those who travel it, and report their doings to him (the Governor) by a certain day ;" now, can the corporation collect a fine of him who passes the gate refusing to pay after the expiration of the old charter and before the affixing a new rate of toll under the new ? It cannot be done. And yet it appears to us a parallel case with the one under consideration.

If the fine was not certainly fixed on the plaintiff, and certainly collectable by means of his not appearing on the parade ground, at the time, then we think no one will pretend that it can be collected *now.* What would have been the effect produced by captain Wright and his company being by the board of officers placed in another regiment than that of col. Morse ? 1st. The entire relation of officers and soldiers would have been changed. 2nd. The plaintiff would have been tried by a court martial of a regiment in which he had never offended, or in a regiment where he was not bound to train ; besides it would be revolting to every military principle

and feeling, to send a delinquent from one corps to another for trial and punishment. 3d. For a colonel of one regiment to send his mandate into another regiment to arrest a soldier belonging to the latter, might result in great mischief to both.

These suggestions sufficiently show that the plaintiff's liability was not fixed, by his not appearing on parade according to the order of captain Wright. If liable at all, it was upon a contingency, and that contingency was to be brought about or not, by the doings of the board of officers, appointed to reorganize the militia. Hence the conclusion seems to be irresistible, that the militia of the county were not in an organized condition on the first Tuesday of June, 1838.

*T. Bartlett* and *J. D. Stoddard* for defendant.

I. The defendant contends that the legislature did not intend to abrogate the military system by the act of 1837, but to retain the old organization until it should be superseded by the new.

This is to be gathered from the statute itself, which, like all other general laws of the state, took effect and became a binding law upon the citizens on the 1st of January after its passage. Thus on the first day of January, 1838, the new law governing and regulating the militia, as organized under the old law, (the statute of 1818,) took effect, pointing out and prescribing rules and duties for the governed, and those who govern.

Whatever was done under the act of 1818, cannot be annulled by the act of 1837, but must abide until it is superseded by some new arrangement.

That the legislature did not intend, by the act, to abandon and annihilate the old organization until the new was completed, is evidenced by the following sections of the act; section 4, page 21; section 1, page 22; section 19, page 29; section 21, page 30; section 1, page 34; article 10, page 36. The duties required by those sections of the act are inconsistent with the several positions contended for by the plaintiff. Again, article 12, page 37, requires that " any officer neglecting or refusing to make a draft or detachment when ordered in pursuance of the duties of this act, shall be arrested and liable to be tried by a court martial, and the officer next in command shall be ordered to make the detachment.

· Suppose, that in the winter of 1838, the Governor had ordered the defendant, as colonel of the 16th regiment, to make a detachment to protect the citizens of the state against some sudden invasion or insurrection. According to the reasoning of the plaintiff, the defendant should say to the commander in chief, that the legislature, by their act of 1837, had abolished the military system, and he could not comply with his excellency's command, until the militia system should be again revived. See sec. 18, 19 and 20, on page 38; sec. 1, page 40 ; sec. 1, page 53 ; sec. 2, page 54.

Sect. 14, page 57, provides that the board of officers, provided for in the 1st sect. of the 2d chapter, shall have the power of disbanding independent companies, and power to alter the limits of divisions, brigades, regiments and companies. And if the act itself disbanded the companies it would seem to be needless to clothe the board of officers with such power, though the power is expressly denied to said board of officers to disband any company of artillery, light infantry or riflemen, which should be a full company at the time, p. 58. Both of these provisions most clearly indicate that the legislature had no intention of abrogating the military system as then organized, even from the first of January until the first of May, after its passage.

The plaintiff contends that the legislature contemplated the conpletion of the new organization before the 1st Tuesday of June 1838, but inasmuch as it was not perfected at that time, the plaintiff was not liable to do military duty on the first Tuesday of June 1838, and that capt. Wright had no jurisdiction or command over him. The regiment was organized on the 7th day of July, 1838, but the standing company in St. Johnsbury, in which the plaintiff was enrolled, and of which company he 'was a member, remains a standing company as it was before the statute of 1837, and said company was in no way altered, organized or reorganized by the board of officers, but it retains its old standing and condition. Now the case admits that the company, on the 7th day of July 1838, was a legally organized company. To which statute, then, is the company indebted for its present legal existence. Is it the statute of 1837, or that of 1818 ?

If the company owes its existence- to the act of 1837, it

must have been organized by the act itself, without the intervention of the board of officers, and must date its existence from the first of January 1838.

Again, if on the first Tuesday of June, 1838, the commandants of companies had no power to call their respective companies together for military discipline, and inspection of arms, how was it to be ascertained upon what principles the grand list should be made up ? How were listers in the respective towns to ascertain the number of polls equipped ?

II. The legislature may *regulate* the militia, but cannot abolish it.

The opinion of the court was delivered by

COLLAMER J.—This is an action of trespass for property, taken on an execution signed by the defendant, as commanding officer of the 16th regiment of Vermont militia. It rests on a case stated and agreed upon by the parties, by which it appears that the plaintiff was delinquent of duty, at the annual company training, in June, 1838. This was in a company, and in a regiment, regularly organized under the statute of 1818, and no new organization took place under the statute of 1837, until July 1838. The principal question therefore is this ; was there any existing militia company in May and June 1838?

Under the act of 1818, the whole militia of Vermont was organized into divisions, brigades, regiments and companies. In 1837, an act was passed " for regulating and governing the militia." By the 17th section, xv chapter, of that act, all former acts regulating and governing the militia were repealed. It is now insisted that this dissolved the whole militia of the state into its primitive elements ; that its whole organization absolutely and immediately ceased and it was disbanded.

As a general rule the repeal of a law puts an end to that which was created directly by the law itself. But when a matter is authorized by the law to be done, and it is done, and rights and duties of a public or private concern, are thereby created and accrue, they are not undone nor affected by a repeal of such law. The repeal of a law under which a legal settlement has accrued does not affect such settlement.

The repeal of a law of conveyances does not destroy any titles obtained under it. The repeal of a law giving jurisdiction to a court does not annul its judgments or decrees. The statute of 1818, *by itself*, made no organization of the militia. It created no regiment or company. It authorized certain persons to make an organization. The organization then was not made *by the law*, but, *under* that law, regiments and companies were formed and they would therefore continue, notwithstanding the repeal of the law. The statute of 1837, "for regulating and governing the militia," found an organized militia on which to operate and which it would regulate and govern until some different organization was actually perfected under such law itself. Such would be its effect, notwithstanding the repealing clause, and such, it is to be presumed, was intended to be its effect, unless the general or particular provisions of the law itself are inconsistent with this view. On examination of the statute of 1837, so far from finding its provisions inconsistent with this view, I think it obvious that it was never contemplated that the militia was to be considered as disbanded or disorganized, but that the divisions, brigades, regiments and companies retained, and were all to retain, their existence until a new arrangement was actually made under the new statute. The 2d chapter directs an organization by commissioners to be appointed by the Governor. This, until actually carried into effect, could not produce a disbanding of the militia. By the 14th section, chapter xv, this board of commissioners are authorized to *disband* independent companies. This shows they were not already *disbanded by law*. They also had power to *alter* the limits of divisions, brigades, regiments and companies. But if, by the repeal, all such ceased to exist, then there would have been none to *alter*. All were to be *made*. It was further provided that if by reason of the *alterations*, any two officers of the same grade were thrown together, the junior became a *supernumerary*. This shows he was in command until rendered supernumerary *by the alteration when made*.

By the first proviso to that section, the board were prohibited from disbanding any company of artillery, light infantry or riflemen, who had their complement of men. Most clearly then they were not disbanded by the law, already, but still

VOL. XII.   W. R. VOL. II.        70

CALEDONIA,
*March*,
1840.

Gilman
*v.*
Morse.

held and were preserved in existence, notwithstanding the repeal of the law under which they were first organized. The whole law could and well did go into operation on the existing militia until a new organization was made, under the 2d chapter, and a view of the whole statute and its particular expressions and provisions is consistent with no other hypothesis.

There is another view of this subject in confirmation of the same principle. In the constitution of the United States, article 1, section 8, in enumerating the powers of congress, is this clause; " to provide for *organizing*, arming and disciplining the militia and governing such part as may be employed in the service of the United States, reserving to the states respectively the appointment of the officers and the authority of training the militia according to the discipline prescribed by congress," Here the power of *organizing* the militia was vested in congress. In 1792 they exercised this power by passing a law "establishing a uniform militia throughout the United · States." This provides who shall compose the militia, how enrolled, officered and equipped,&c.; that they shall be divided into divisions, brigades, regiments and companies as the legislature shall direct. By that act the legislatures of the states were authorized to proceed and organize the militia, and it was by that act of congress the organization was created and upheld. Though the legislature might, from time to time, new-model and recast the arrangement of the parts, yet the basis of all was the act of congress under the constitution ; and without the repeal of this act of congress, the militia, which had been organized under it, could not be disbanded. The state legislature could no more disorganize or disband the militia, which it had organized, by direction of congress, under the constitution, than the board of officers could *disorganize* it after having completed their duty of organization under the act of the legislature. The states, *severally*, cannot thus *destroy* this branch of the national defence, nor do we think our legislature intended or attempted so to do.

Calvin Wright was, then, in June, 1838, commanding captain of the company of which the plaintiff was a member, bound to do duty. By neglect of that duty in that month, the plaintiff incurred the penalty provided for such delinquen-

cy, in the statute of 1837. That penalty, by that law, was to be enforced by a regimental court martial, and it was so done. It is now insisted that inasmuch as that regiment was not organized until July, 1838, the plaintiff could not be subject to its jurisdiction for a delinquency in June previous. It is not necessary that a court should exist at the time a cause of action accrues, in order to have jurisdiction thereof, nor that the geographical limits of such jurisdiction should have been then defined, and included the party. If a man has been visited with a duty or incurred a penalty, under the law, he is liable to the jurisdiction which then or afterwards may be created, by law, clothed with jurisdiction of the case. If a new court is created, it is no objection to its jurisdiction that the cause of action arose before the court was organized. If the geographical limits of the jurisdiction of a court be changed, it will take jurisdiction of all local causes within its new jurisdiction, though the cause of action arose previously. The plantiff had been guilty of a delinquency and incurred a penalty in June, 1838, under the law of 1837. In July, 1838, a court was organized which had jurisdiction of such penalties and over that section or limit. That court had jurisdiction of the plantiff's case and it is no objection that the court did not exist in June.

<div style="text-align:right">Judgment for defendant.</div>

<div style="text-align:right">Caledonia,<br>March,<br>1840.<br><br>Gilman<br>v.<br>Morse.</div>

REDFIELD, J., dissenting.—The reasons which induce me to entertain a different opinion from that now expressed by the court are these. I think the case is not one of that importance, either in itself, or in its bearing upon any leading principles, in the complicated system of jurisprudence, which might influence the determination of other cases, so as to require any departure from the plain and obvious track which lies open before us. Ordinarily, I do not think it safe to decide any case with a prominent view to "tramel up consequences," and hence I do not esteem the *argumentum ab inconvenienti* of much force. I know that like the *argumentum ad hominem*, and many other of the subtleties of the ancient logicians, it has a kind of point and piquancy, which gives an air of plausibility, but, like most other refinements in learning, is fair without, but inwardly full of infirmity and imperfection. I do not pretend to deny there

may be cases, where a court of law, in the last resort, as a kind of *custos morum*, or *conservator Reipublicæ*, in order to prevent some manifest evil, or to procure some obvious and important good, which had not been anticipated by the law-makers, and, by consequence, not sufficiently provided for or against, would be justified *in a very considerable departure from the apparent import of a statute, as deduced from its phraseology merely.* But such cases are of rare occurrence, and of so decided a character as not to be esteemed doubtful. The great standing rule of construction, in regard to written law, and the only safe rule, for common minds at least, is to adhere to the natural import, as deduced from the whole statute according to the fair and common signification of its terms, with reference to the subject matter, in its ordinary incidents. The present is not a case of very momentous importance to the parties, even, and one whose like will probably never occur again. It is one, too, where the defendant was under no necessity of acting, but where he came forward voluntarily to exercise upon the plaintiff, then an infant, the prerogative of inflicting an amercement, a power always odious, but doubly so in a case of doubt, and where the party coming under censure may be supposed to have acted conscientiously. I do not think therefore that the court are called upon here, to seek out an unnatural ground of construction for the purpose of shielding the defendant in the exercise of what he, no doubt, considered a just exercise of legitimate authority, but which plain, common men, I think, would have esteemed at least questionable.

1. Then I think the legislatures of the several states have the power to alter, or discontinue the arrangment or organization of the militia within their own limits.

It is true, that, by the constitution of the United States, Art. 1, sec. 8, congress have the power "to provide for orgainzing, arming and disciplining the militia, reserving to the states, respectively, the appointment of the officers and the authority of training the mititia, according to the discipline prescribed by congress." Now this section of the U. States' constitution, undoubtedly gives congress the power to " organize the militia of the several states ;" and when they have once assumed that province, their action upon the sub-

ject must be exclusive of any state legislation.  But until that
time, I apprehend, there can be very little doubt that the
states have the right and must of necessity make laws upon
the subject.  This subject rests upon the same basis, mainly,
with other subjects of legislative power, which are reserved
to congress, and which, by the United States' supreme court,
have been held to deprive the states of no legislative author-
ity, until congress assumed to act upon those subjects.  I re-
fer to the subject of bankruptcy.  And I should perhaps
have included the subject of surrendering, to foreign states,
fugitives from justice, in the same category, until the very
singular decision of that subject, which took place in the
United States' supreme court, in the case of Holmes.  That
case, I take it, if it settles any principle, establishes the very
uncourteous rule, that the power to surrender fugitives from
justice to foreign states, (where they have committed the
most bloody and unprovoked murders, even,) does, in fact,
in the American states, exist nowhere, unless, at the time, a
treaty stipulation upon that subject happens to exist between
such foreign state and the United States.  But that court,
many years since, did decide, in relation to bankrupt laws,
that the reservation to congress of the power to legislate up-
on the subject, deprived the states of no power to pass laws
upon the same subject, until after congress had assumed that
province.  *Sturges* v. *Crowningshield,* 4 Wheaton, 122.
5 Cond. R. 409. *Ogden* v. *Saunders,* 12 Wheaton, 213.  6
Peters' Cond. R. 523.

In regard to the militia, the argument in favor of the same
rule is even more conclusive than can well be adduced in re-
gard to bankrupt laws.  All the old states, (and Vermont al-
so,) had had a regularly organized militia for many years be-
fore the adoption of the United States constitution.  It can-
not be well supposed that by the adoption of this constitution,
it was the intention of the states perpetually to disband
the militia until such time as the congress of the United
States should see fit to organize them.  And this, too, when
the several states have the power to call out the militia to
repel invasion, as well as to quell insurrection, or to enforce
their own municipal laws.

The fact, too, that congress never did exercise this power,
but expressly referred it to the *several states,* and that they

CALEDONIA,
March,
1840.

Gilman
v.
Morse.

have continued to exercise it *ad libitum,* is a contemporaneous exposition and a practical construction, which no court would now feel at liberty to depart from. *Stuart* v. *Laire,* 1 Cranch, 299. 1 Peters' Cond. R. 316.

The first act of congress upon this subject, which was of any general extension, or which was not immediately repealed, was passed May 8, 1792. And that act is now in force, with very few, and no important, amendments or alterations. The first section of that statute provides, that certain persons in the several states shall be enrolled in the militia. The second section exempts certain persons from enrollment, and the third section provides " that within one year, after the passing of this act, the militia of the several states shall be *arranged* into divisions, brigades, regiments, battalions and companies, *as the legislature of each state shall direct.*" This is all that is said upon the subject of "organization." It is evident the term "*arranged*" is here used as co-extensive with *organize.* The whole power upon this subject is expressly referred to the state legislatures, and since that time it has been constantly exercised by those legislatures. The organization or arrangement then in force, in the several states, would continue in force until some new arrangement was made. This very point was in effect expressly decided, as now argued, by the United States court in *Houston* v. *Moore,* 5 Wheaton, 1.

The legislature of this state had passed a very voluminous statute upon that subject, March, 8, 1787, extending into the most minute details. (The system had however been adopted much earlier.) In this statute the several captains are required to enroll all persons of a given description " within their respective *beats.*" The commander in chief for the time being (the Governor) is required to *arrange* the whole of the militia into divisions, brigades and regiments. The colonels of the several regiments were to arrange the companies.

On the 29th of October, 1793, the legislature passed a law revising the whole subject and provided " that the Governor, by and with the advice of the council, shall *arrange* the whole of the militia into divisions and brigades ;" and the subordinate officers are required to complete the *arrangement.* And it is here expressly provided, " that the *present*

" arrangement shall continue, *as it now is,* until the Govern-
" or, by and with the advice of the council, shall otherwise
" order." That system was subsequently revised, in 1797,
and in 1818, in both of which revisions precisely the same
provisions in regard to the arrangement, as that found in the
statute of 1793, is re-enacted *verbatim.* But in the revi-
sion of 1837 no provision whatever is made for continuing
the former arrangement, and all former acts are expressly re-
pealed, saving only to the officers their commissions and
all penalties which had accrued. From all which I consider
that the power in the state legislatures to make the arrange-
ment or organization of the militia, in the first instance, and to
alter the same, at will, is made sufficiently obvious. And if
it is at their election to make and alter the organization, it
cannot be doubted they may wholly discontinue the same
either permanently, or until they can make a new organiza-
tion. I infer this because, in the first instance, the states
were under no *obligation* to organize the militia, that power
being reserved to congress. It is true congress might leave
it to them, as it did; but even then, if the states acted, the
action was voluntary, on their part, and might at any time be
withheld. The organization, when made, was not a national,
but a state organization, else it could not be altered by the
state legislature. And if it was a state institution, merely, it
might be abrogated by state authority.

If then the state legislature had the power to discontinue
the organization of the militia, they must do it by an act of
legislation, for by that was it created. But could it be ne-
cessary that it should be done by any *positive exertion of
power?* It was only by force of an act of the state legis-
lature that it was from day to day upheld. When that
force was removed, it must fall of itself. It was but a
consequence or incident depending for its life upon the
statute, merely, and when the fountain was dried up,
the stream must fail. To argue the contrary would confound
all our notions of cause and effect, and render the most uni-
form experience of no value. It would be to make the
branches of the tree live and flourish, when the trunk had
been removed. For it cannot be argued, with the least pro-
priety, that the organization of the militia is a thing apart

from the authority which upholds the system itself. When all laws upon that subject are repealed, all relations created by them must cease to exist as effectually as if the laws had never existed.

Could it be said, with any propriety, that the rules of this court were of any force, or that the clerk of this court had any authority, when every legal provision, by which the court itself was created, had ceased to exist? What would be the condition of an auditor appointed by this or any other court, when the court itself was abolished? I take it, that man would be considered a bold man, who should argue that the force of the rules of court, or the authority of the clerk or auditor, remained the same after the court was abolished, as before. .

2. I come, then, to my second proposition, which is, that if the legislature had the power to discontinue the organization, they need only repeal the statute by which it was created and upheld, in order to effect that object. This they have done.

3. I think the legislature intended to discontine the old organization and to leave the militia of the state wholly unorganized, until it could be organized in the manner pointed out by the new statute, passed November 1, 1837, which came in force January 1, 1838.

1. The second chapter of that statute is entitled " organization." By this chapter it is made the duty of the Governor to " organize" the militia of this state in the manner pointed out. Now we do not ordinarily speak of organizing what is already in an organized state, but of *reorganizing* or *organizing anew.* We apply the term *organize* to that which is in an *inorganic* or *unorganized* state.

2. It is provided that this organization shall take place on or before the first day of May following, which would be long before any training of the militia would occur ; and as soon as, in this nothern climate, any military expedition could be set on foot against us so as to require their aid to repel invasion, which was the most remote of all possible contingencies ; and if their aid had actually been required during the inclemencies of the winter for that or any other purpose, the governor, under the provisions of the law, could have effected the organization of the entire force in a very few days at most. So that this argument, *ab inconvenienti,* which al-

ways sounds well, and is easily got up, is, in the present case, as usual, of very little weight.

3. It is evident that the law of 1837 was intended to be an entire system by itself, and did require, and was intended to apply exclusively to another organization, else the provision of the former acts, in regard to keeping the old organization until a new one could be effected, and which had been kept along through three successive revisions, from 1793, until 1837, almost half a century, would not now, for the first time, have been omitted.

4. It is said the new law applied immediately to the old organization, and thus the former officers were continued in their command, even before any other organization. This course of argument is indeed the only one which will justify the amercement in the present case. It would seem not a little singular, when in this same statute an express provision is made, reserving to the officers their commissions, if, at the same time, the legislature intended, not only to preserve to the officers their commissions, but their command, that an express provision should have been deemed necessary to effect the first object, and the latter, which would be far more important, and infinitely more questionable, should have been left wholly to inference and presumption.

5. There is an express provision in the statute of 1837, that the organization required to be effected, shall be published with the act, as an appendix thereto, and be forthwith circulated among the militia, thereby showing as conclusively as any thing, short of an express provision, that it was intended the statute and the organization should take effect together, and the one not operate until the other was completed, or, at least, that the operation of each should be co-extensive with the other.

In short, it is evident the new system was never intended to apply to the old organization, and in compelling this application, we are, I think, providing for a state of circumstances which the legislature did not anticipate.

The argument attempted to be deduced from the provision of the statute of 1837, that the committee might disband independent companies, is easily answered, by supposing the legislature, out of over caution, and to prevent all controver-

CALEDONIA,
March,
1840.

Gilman,
v.
Morse.

sy on the subject, and as these companies were voluntary associations and might claim special privileges on that ground, introduced this provision.

In conclusion, I think, therefore, that the fact, whether the plaintiff belonged to captain Wright's company, or captain Wright's company to the defendant's regiment, or whether in fact, the defendant, or captain Wright, should have any command, and if so, what command, was not determined at the time the plaintiff was required to train ; and that the amercement was an arbitrary act of power, without right, and the defendant liable in trespass for the consequences.

As this case has been twice argued, and at different times, before every member of the court, three of whom, including the chief justice, who is now absent, having come to the conclusion that the judgment below should be reversed, judge Bennett wishes me to say it is on that ground he consented to have the case decided, as it has been; although at both arguments, he has felt compelled to concur in the views which I have myself expressed.    I myself, too, think, under the present state of the opinion of the different members of the court, that the parties should not be put to the expense of another argument.