2012 VT 32

# City of Montpelier v. Richard Barnett, Cedric Sanborn, Leslie Sanborn and Natural Resources Board

[49 A.3d 120]

No. 11-067

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed May 11, 2012

*Glenn C. Howland* of *McKee, Giuliani & Cleveland, P.C.*, Montpelier, for Plaintiff-Appellee.

*Oreste V. Valsangiacomo, Jr.* of *Valsangiacomo, Detora & McQuesten*, Barre, for Defendants-Appellants.

¶ 1. **Dooley, J.** Defendants appeal from a judgment ruling that the City of Montpelier may prohibit boating, fishing, and swimming in Berlin Pond, a public body of water located outside the City and used as the City's drinking water supply. The City contends that the restrictions are supported by both a state health order and the powers granted to the City by the State. The trial court agreed and issued a permanent injunction preventing defendants from engaging in the listed recreational activities and from trespassing upon land surrounding the pond that is owned by the City. For the reasons set forth below, the judgment enjoining defendants from boating, fishing, and swimming in Berlin Pond is reversed.

¶ 2. Although we are sympathetic to the City's significant concern for regulating the source of its drinking water, the City's powers are limited to those conferred upon it by the State of Vermont. After careful examination of the state statutes and the City's charter, we are unable to find any direct or indirect authorization for the City to regulate recreational use of Berlin Pond. On the contrary, the State has developed its own regulatory schemes to govern both public water sources and recreational use of public waters. Under neither of these schemes has the State prohibited the recreational uses at issue here. Our opinion today does not hold that recreational use of Berlin Pond must be permitted. We conclude only that valid regulation would require action by the State — either by direct regulation or by delegating such power to the City — and this has not yet occurred.

¶ 3. Berlin Pond is a natural body of water, roughly two miles long and covering approximately 256 acres. There is little development surrounding the pond, although Interstate Highway 89 runs just to its east. Despite the fact that it lies in the Town of Berlin roughly three miles outside the City of Montpelier, Berlin Pond has supplied Montpelier with a gravity-fed water supply since 1884. The City's reliance on the pond for water dates back to the Village of Montpelier's purchase of the rights to take water from the pond, pursuant to authority granted in a charter amendment in 1872. See *Lucia v. Vill. of Montpelier*, 60 Vt. 537,

538, 543 (1888). Presently, the water from Berlin Pond reaches about nine thousand users, including most residents and businesses within the City — not to mention this Court.

¶ 4. The water from Berlin Pond passes through two processes before it reaches the user. Since 2000, the water is first filtered at a new filtration plant constructed by the City. The filtration process removes particulate matter from the water, eliminating most of its turbidity. After filtration, the microorganisms in the water are nullified through chlorine disinfection.

¶ 5. This suit arises because Montpelier has taken steps to protect its water source. Over the years, the City has acquired almost all the land surrounding the pond. The only exception is an eighty-five-foot access strip that is owned by the Town of Berlin. The City has placed "no trespassing" signs around Berlin Pond and has posted the land around it against hunting and fishing. The City has a general trespass ordinance that reads: "It shall be unlawful for any person to trespass upon or injure public buildings, squares, commons, cemeteries, fountains, statutes [sic] or any other public property or resources owned by or under the control of the City of Montpelier." Montpelier, Vt., Code of Ordinances § 13-1 (enacted 1972). Additionally, the City has passed an ordinance aimed at protecting the water supply, which states:

> No person shall throw, put or place, or cause to be thrown, put or placed, in any public reservoir, or stream connected therewith, or waters in the city, any stone, dirt, ashes, shavings, stocks, garbage, rubbish or filth of any kind, nor shall wade or bathe or fish in or cause or permit a dog or animal to go into or swim in the water, nor skate on the ice of a public reservoir.

Id. § 3-332 (enacted 1970). According to the City, human activity in and around the pond threatens an increase in trash and waste including petroleum products that cannot be removed through filtration; the introduction of invasive plant and animal species including zebra mussels, which are not currently in the pond and which can block water intakes; and an increase in turbidity because activity stirs up dirt and silt in the water. The City has few viable alternative water sources if Berlin Pond were to become contaminated. During the course of this litigation, the City added a further ordinance stating: "It shall be unlawful for any person to trespass, occupy, or enter upon the surface of Berlin

Pond, or any tributary thereof, or the lands adjacent thereto owned by the City of Montpelier without the permission of the City Council . . . ." *Id.* § 13-3 (enacted 2010).

¶ 6. We reiterate some of the facts above because they are central to the outcome of this case. Berlin Pond does not lie within the City of Montpelier; Montpelier does not abut the pond. Montpelier does not "own" Berlin Pond; it owns most of the land surrounding the pond and has a right to take water from the pond. As the following discussion explains, this is as much a legal statement as a factual statement, but it helps explain our decision.

¶ 7. Defendants Cedric and Leslie Sanborn own a local sporting goods store, and defendant Richard Barnett is employed at the store. Beginning in 2009, defendants began to explore the possibility of using the pond for recreational activities. It was then — and continues to be — their belief that the State of Vermont has exclusive jurisdiction to regulate use of Berlin Pond under the public trust doctrine. They further believe that the State has not prohibited recreational use of Berlin Pond.

¶ 8. This latter belief derives from certain actions by the Water Resources Panel and the Agency of Natural Resources (ANR). The Water Resources Panel, a component of the Natural Resources Board (NRB), is a public body responsible for adopting water quality standards and rules for the use of public waters, which ANR is then responsible for administering and applying. See 10 V.S.A. § 1258. The Panel has classified Berlin Pond as a class A(2) public water supply.[1] See *id.* § 1252; Vermont Natural Resources Board, Water Resources Panel, Vermont Water Quality Standards § 3-03. According to the Panel's description, this classification covers "[w]ater managed for public water supply purposes to achieve and maintain waters with a uniformly excellent character and a level of water quality that is compatible with the following designated uses," among which are swimming, boating, and fishing. Vermont Water Quality Standards § 3-03(A)(3), (4). Rightly or wrongly, defendants interpreted this description to mean that the State permits recreational use. The Panel's rules

---

[1] Somewhat confusingly, the NRB appears to use the designation A(2) for suitable public water supplies and A(1) for ecological waters, although 10 V.S.A. § 1252 defines the classifications in the reverse order. Nomenclature aside, the point is that the NRB's classification describes management compatible with recreational uses where possible.

for water use, established pursuant to 10 V.S.A. § 1424, further encourage this understanding because, as discussed specifically *infra*, they place restrictions on the use of Berlin Pond that do not include restrictions on swimming, fishing, or boating.

¶ 9. On September 6, 2009, Cedric and Leslie Sanborn ventured out on Berlin Pond in kayaks. The Montpelier Police Department arrested them and charged them with four counts: intentional violation of a state health order in violation of 18 V.S.A. §§ 122, 130; intentional interferences with a protected drinking water source in violation of 10 V.S.A. § 1682; violation of Montpelier's above-described ordinance against misusing a reservoir; and violation of Montpelier's ordinance prohibiting trespassing on city property or resources. The Washington County State's Attorney eventually dismissed these charges. A few months later, in March 2010, Barnett obtained a permit from the Department of Fish and Wildlife (DFW), a division of ANR, to hold an ice fishing derby on Berlin Pond, and he began circulating advertisements for the competition.

¶ 10. These events prompted the City of Montpelier to initiate the present action against the defendants seeking a declaratory judgment that boating, fishing, and bathing is prohibited and a preliminary and permanent injunction, civil fines, and reimbursement of litigation expenses. The Washington Superior Court, Civil Division, initially ordered that the State — specifically NRB — be joined as a necessary party, which the City did. On April 16, 2010, the court held an evidentiary hearing on the request for a preliminary injunction. At the hearing, the defendants offered testimony of two DFW wardens who explained that the State has jurisdiction to regulate fishing and has not prohibited it on Berlin Pond. The City countered with testimony from the director of the City's public works department explaining the capabilities and limitations of the water treatment system and testimony from a former municipal health officer describing the potential health impacts of recreational use.

¶ 11. Following the evidentiary hearing, the court granted the request for a preliminary injunction. At this time, the State, at its own request, was excused from the litigation, having taken a neutral position. At the hearing, the State had asserted that "[t]he state does not have a position on whether the City of Montpelier's restrictions are valid or not," and in its limited court filings the State explained that "[v]iolation of state fish and wildlife laws

and/or a state permit are not at issue in these matters" and that the state statutes and rules "speak for themselves; their legal effect is a question for the Court to decide."

¶ 12. In August 2010, after denying summary judgment both to defendants and to the City, the court accepted a stipulation according to which the City's request for fines and reimbursement was dropped but its request for declaratory and injunctive relief remained before the court. It set a trial for December. At trial, neither side presented evidence beyond what was already in the record from the hearing on the preliminary injunction. On January 28, 2011, the court entered judgment in favor of the City. The court adopted its findings entered at the time of the preliminary injunction and, on that basis, granted the City a permanent injunction against defendants, which enjoined them from trespassing on the City's property surrounding Berlin Pond and from boating, fishing, or swimming in Berlin Pond. Defendants appeal.

¶ 13. The validity of the City's ordinances is a question of law and therefore subject to de novo review. See *In re Vill. Assocs. Act 250 Land Use Permit*, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712. In addressing this question, however, we accept the trial court's findings of fact as long as they are supported by the evidence. See *Whippie v. O'Connor*, 2010 VT 32, ¶ 12, 187 Vt. 523, 996 A.2d 1154.

I.

¶ 14. Before we reach the merits, we address the one procedural issue raised by defendants. Defendants argue that, because the State holds Berlin Pond in trust, the trial court erred in dismissing the State as a party. Defendants contend that, because they are attempting to vindicate the public's rights that are held in trust by the State, the State is the real party in interest, not defendants. In making this argument, defendants rely on Vermont Rule of Civil Procedure 17(a), which reads, "Every action shall be prosecuted in the name of the real party in interest." Rule 17(a) does not apply here. It pertains to the party bringing the suit. See 6A C. Wright et al., Federal Practice and Procedure § 1542, at 469 (3d ed. 2010) ("[T]he term directs attention to whether plaintiff has a significant interest in the particular action plaintiff has instituted, and Rule 17(a) is limited to plaintiffs."). The City is the plaintiff in this suit, and defendants do not contend that the City is not a real party in interest.

■ ¶ 15. The applicable rule is Rule of Civil Procedure 19. The State was properly joined as a necessary party defendant under Rule 19(a), which provides:

> A person who is subject to service of process shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the person's claimed interest. If the person has not been so joined, the court shall order that the person be made a party.

The relevant portion is clause (2)(i). As discussed below, the State has an interest in Berlin Pond as public trustee, and protection of that interest might have been impaired in its absence by a decision in favor of the City. It was therefore proper that the trial court ordered the State to be joined as a party. And it was equally proper for the court subsequently to dismiss the State. After being joined, the State refused to align its interests with either party, essentially avowing to the court that it did not have an interest that would be jeopardized by deciding this case in its absence. This removed the basis for Rule 19 joinder, so there was no error in dismissing the State.

## II.

¶ 16. In addressing the merits, we begin from the premise that any regulation by the City of the use of Berlin Pond must ultimately be derived from, and limited by, the State's original power over the pond. This premise is based on the confluence of two longstanding legal principles: the public trust doctrine and Dillon's Rule. According to the public trust doctrine, the State of Vermont holds Berlin Pond in trust as a navigable public water; according to Dillon's Rule, the scope of the City of Montpelier's authority to regulate Berlin Pond is limited to the authority granted by the State.

¶ 17. State trusteeship over navigable waters has a lengthy and somewhat mythic pedigree dating back to Roman and English law.

450

The first oft-cited origin lies in Justinian: "By the law of nature these things are common to mankind — the air, running water, the sea, and consequently the shores of the sea. No one, therefore, is forbidden to approach the seashore . . . ." Institutes bk. II, tit. 1, § 1 (T. Sandars trans., 1st Am. ed. 1876). Glimmers of this idea of common trusteeship are found in the Magna Carta, which, among other things, placed constraints on the crown's authority over navigable waters and fisheries. See, e.g., H. Sun, *Toward a New Social-Political Theory of the Public Trust Doctrine*, 35 Vt. L. Rev. 563, 570 (2011) ("In England, thanks to the Magna Carta, the public trust doctrine was included as part of English common law in order to restrict the Crown's proprietary control over certain natural resources."). The extent to which these early conceptions prohibited private ownership is an open question, see P. Deveney, *Title, Jus Publicum, and the Public Trust: An Historical Analysis*, 1 Sea Grant L.J. 13 (1976) (contesting the modern public trust doctrine's history in Roman and English law); see also J. Huffman, *Speaking of Inconvenient Truths — A History of the Public Trust Doctrine*, 18 Duke Envtl. L. & Pol'y F. 1 (2007) (similar), but it is clear that natural resources including navigable waters were considered to be at least initially common property subject to certain public rights. As the U.S. Supreme Court has explained, this idea became part of American common law: "[W]hen the [American] Revolution took place, the people of each state became themselves sovereign; and in that character hold the absolute right to all their navigable waters and the soils under them for their own common use, subject only to the rights since surrendered by the Constitution to the general government." *Martin v. Lessee of Waddell*, 41 U.S. (16 Pet.) 367, 410 (1842); see also *Ill. Cent. R.R. v. Illinois*, 146 U.S. 387, 452 (1892) ("It is a title held in trust for the people of the State that they may enjoy the navigation of the waters, carry on commerce over them, and have liberty of fishing therein freed from the obstruction or interference of private parties."); cf. 1 V.S.A. § 271 (stating that English common law is the law of Vermont if "applicable to the local situation and circumstances" and "not repugnant to the constitution or laws").

¶ 18. Since 1777, the public trust doctrine has been entrenched in the Vermont Constitution, which reads:

The inhabitants of this State shall have liberty in seasonable times, to hunt and fowl on the lands they

hold, and on other lands not inclosed, and in like manner to fish in all boatable and other waters (not private property) under proper regulations, to be made and provided by the General Assembly.

Vt. Const. ch. II, § 67; see also R. Brooks, *Speaking (Vermont) Truth to (Washington) Power*, 29 Vt. L. Rev. 877, 885 (2005) ("This provision has been [taken] to establish a public trust in Vermont's natural resources which is now recognized in her statutes and regulations."). As explained, the public trust doctrine means that navigable waters and the land below them are held in common by the people of this state. *Hazen v. Perkins*, 92 Vt. 414, 419, 105 A. 249, 251 (1918) ("Being public waters according to the test afforded by the Constitution, the grants of land bounding upon the lake pass title only to the water's edge, or to low-water mark if there be a definite low-water line. The bed or soil of such boatable lakes in this state is held by the people in their character as sovereign in trust for public uses for which they are adapted." (citations omitted)); see also *State v. Cent. Vt. Ry.*, 153 Vt. 337, 344, 571 A.2d 1128, 1131 (1989) (explaining that *Hazen* "stands for the proposition that the legislature cannot grant rights in public trust property for private purposes"). We have explicitly applied this principle to Berlin Pond itself: "Berlin Pond being public . . . its waters [and] the land beneath them . . . belong to the people in their sovereign character, and are held for the public uses for which they are adapted." *State v. Quattropani*, 99 Vt. 360, 363, 133 A. 352, 353 (1926). This trusteeship does not prevent regulation, but it does demand that regulation have a special public character, both in its aims and in its formation. See J. Sax, *The Public Trust Doctrine in Natural Resource Law: Effective Judicial Intervention*, 68 Mich. L. Rev. 471, 558-60 (1970) (describing the role of the public trust doctrine as one of "democratization" whereby the courts "thrust[] decision making upon a truly representative body").

■ ¶ 19. In this light, delegation of the State's role as trustee need not be disfavored, even though abandonment of the public trust would be. Compare *Cent. Vt. Ry.*, 153 Vt. at 347-48, 571 A.2d at 1133 (" '[S]tatutes purporting to abandon the public trust are to be strictly construed; the intent to abandon must be clearly expressed or necessarily implied; and if any interpretation of the statute is reasonably possible which would retain the public's

interest in tidelands, the court must give the statute such an interpretation.'" (quoting *City of Berkeley v. Superior Ct. of Alameda Cnty.*, 606 P.2d 362, 369 (Cal. 1980))), with *Elliott v. State Fish & Game Comm'n*, 117 Vt. 61, 69, 84 A.2d 588, 593 (1951) ("[R]egulations, proper in the sense that they complied with constitutional requirements, might be made by the Legislature through a delegation of the power to make such regulations to a body or person given jurisdiction by the Legislature over matters pertaining to fish and game . . . ."). Thus, the State may, compatible with holding Berlin Pond in public trust, delegate certain authority to regulate its use to another body, in this case the City of Montpelier. A main question before us is whether such a delegation has occurred here.

■ ■ ¶ 20. A municipality may thus assume the state's authority to regulate public waters consistent with the public trust but only where that authority has been conveyed to the municipality by the state. This is true because the power of the municipality is limited to what has been granted by the state. John Forrest Dillon, for whom that principle is named, famously described this idea while Chief Justice of the Iowa Supreme Court: "Municipal corporations owe their origin to, and derive their powers and rights wholly from, the legislature. It breathes into them the breath of life, without which they cannot exist. As it creates, so it may destroy. If it may destroy, it may abridge and control." *City of Clinton v. Cedar Rapids & Mo. River R.R.*, 24 Iowa 455, 475 (1868). We have adopted Dillon's Rule, declaring that "a municipality has only those powers and functions specifically authorized by the legislature, and such additional functions as may be incident, subordinate or necessary to the exercise thereof." *Hinesburg Sand & Gravel Co. v. Town of Hinesburg*, 135 Vt. 484, 486, 380 A.2d 64, 66 (1977); see also *E.B. & A.C. Whiting Co. v. City of Burlington*, 106 Vt. 446, 460-61, 175 A. 35, 42 (1934) ("A municipal corporation is a creature of the Legislature, and it possesses only such powers or rights as are expressly granted to it by the Legislature, or fairly implied in or incident to those expressly granted because necessary to carry the latter into effect."). For better or worse, this rule expresses the liberal commitment to the state as the centralized source of political power. See G. Frug, *The City as a Legal Concept*, 93 Harv. L. Rev. 1059 (1980) (tracing Dillon's Rule and the "powerlessness" of modern cities to liberalism's hostility toward decentralized forms of power). In practice, Dillon's Rule

operates as a canon of construction requiring that grants of power to municipalities be read as limited to those clearly enumerated. See *Valcour v. Vill. of Morrisville*, 104 Vt. 119, 130, 158 A. 83, 86 (1932) ("[I]f any fair, reasonable, substantial doubt exists concerning [a grant of power,] it must be resolved against the [municipality], and its power denied.").

¶ 21. In this case, Dillon's Rule means that the City of Montpelier's regulatory authority over Berlin Pond must be based on an unambiguous grant of power over the pond by the State of Vermont. In this way, Dillon's Rule is consonant with the public trust doctrine. Cf. *Hunters, Anglers & Trappers Ass'n of Vt., Inc. v. Winooski Valley Park Dist.*, 2006 VT 82, ¶ 7, 181 Vt. 12, 913 A.2d 391 ("If the Legislature has delegated sufficient authority to the District to satisfy the demands of the Vermont Constitution, it follows that the District needs no further legislative approval under Dillon's Rule."). Both the public trust doctrine and Dillon's Rule support the proposition that the City of Montpelier cannot regulate the use of Berlin Pond unless its authority derives from the State — as both trustee over public waters and as the source of municipal powers generally.

¶ 22. Implicitly accepting this starting point, the City essentially makes two distinct arguments to show that the State has authorized a prohibition on activities in and around Berlin Pond. The first relies on a 1926 order by the state Board of Health that prohibited boating, fishing, and bathing in Berlin Pond. The City contends that the content of this order is still in force today. Second, the City argues that the State granted it the power to regulate Berlin Pond when it ratified the city charter and that therefore its regulation is a proper exercise of delegated authority. We consider each of these arguments in turn.

### III.

¶ 23. The City's first argument is that the State has itself prohibited boating, fishing, and bathing in Berlin Pond. This argument traces the prohibition on recreational use of Berlin Pond back to a state health order, which, according to the City, has since been implicitly reaffirmed by ANR in approving the City's Source Protection Plan. We reject this argument. Although there clearly was for many years a state health order prohibiting recreational use of Berlin Pond, that order is no longer valid and has not been implicitly adopted by ANR.

¶ 24. The prohibition on recreational use of Berlin Pond has a long history. As early as 1911, this Court upheld a prosecution for bathing in Berlin Pond, in violation of a 1903 state Board of Health order. *State v. Morse*, 84 Vt. 387, 80 A. 189 (1911). The Board of Health at the time had recommended putting in place a filtration system but had issued an order prohibiting bathing, among other things, until a filtration system was installed. *Id.* at 390, 80 A. at 190. This Court concluded that the Board's prohibition "was not only a wise but a valid exercise of the police power, lawfully delegated to the Board." *Id.* at 400, 80 A. at 194.

¶ 25. In a similar vein, on June 8, 1926, the Board of Health issued the following order regarding Berlin Pond, which restated its previous orders:

> Boating, fishing and bathing in the waters of Berlin Pond, of its tributaries for a distance of one-half mile from their mouths, of the outlet of Berlin Pond to the Montpelier Reservoir, and of the Montpelier Reservoir are hereby prohibited.

That same year, this Court was again called upon to review a criminal prosecution for violating a Board of Health order, this time for boating on Berlin Pond. *Quattropani*, 99 Vt. 360, 133 A. 352. We again affirmed the conviction, concluding that the prohibition clearly fell within the Board's realm of authority, see *id.* at 362, 133 A. at 353 ("That the public health is a proper subject for police power protection, and that that power can lawfully be delegated to the State Board of Health, are both unquestioned and unquestionable."), and that the prohibition had some rational basis, see *id.* at 364, 133 A. at 354 ("We cannot say that as matter of law this order was unreasonable and arbitrary."). In short, in 1926, the Board of Health had authority over public drinking water and had imposed a valid prohibition on boating, fishing, and swimming.

¶ 26. Although the 1926 prohibition has not been explicitly repealed, the entire statutory scheme that authorized the order has been eliminated. The 1926 order was made under the authority of a law granting the Board of Health the authority to issue orders prohibiting activities judged to potentially pollute a source of water. See 1917 G.L. § 6313; see also *Quattropani*, 99 Vt. at 362, 133 A. at 353. The law at the time further provided that "[a] person who violates a rule, regulation or order made under the

provisions of this chapter shall be imprisoned not more than one year or fined not more than five hundred dollars." 1917 G.L. § 6322. Subject to minor amendments and reorganization, these provisions continued largely intact until 1989. See 1947 V.S. §§ 7462-7475; 18 V.S.A. §§ 1201-1214 (repealed 1989). In particular, the law continued to recognize the authority of the Board of Health to issue orders pertaining to public water supplies and continued to impose criminal penalties for the violation of such orders. See 1947 V.S. §§ 7468, 7475; 18 V.S.A. §§ 1207, 1214 (repealed 1989). These provisions were repealed in 1989, when the basic source protection processes in existence today were created — the only difference being that the authority that has been vested with ANR since 1991 was at that time vested with the Vermont Department of Health. See 1989, No. 105, §§ 1, 5. Compare 18 V.S.A. §§ 1231-1239 (repealed 1991), with 10 V.S.A. §§ 1671-1679. The 1989 law makes no reference to authority to issue orders nor does it impose penalties for violation of orders.

■ ■ ¶ 27. We conclude that the 1926 Board of Health order ceased to be valid in 1989 when the Legislature repealed both the authorization to create such orders and the prohibition on violating such orders. The common law rule is that when a statute is repealed its repeal reaches back in time to eliminate any authority that existed under the statute. See *Gilman v. Morse*, 12 Vt. 544, 552 (1840) ("As a general rule the repeal of a law puts an end to that which was created directly by the law itself."); *Wieslander v. Iowa Dep't of Transp.*, 596 N.W.2d 516, 522 (Iowa 1999) ("The repeal of a statute typically destroys the effectiveness of the statute, and the repealed statute is deemed never to have existed."); 1A N. Singer & J. Singer, Sutherland Statutes & Statutory Construction § 23:34, at 552-53 (7th ed. 2009) ("Repeal of a statute . . . destroys the effectiveness of the repealed act in futuro and divests the right to proceed under the statute. Except as to proceedings past and closed, the statute is considered as if it has never existed."). This rule applies to a grant of regulatory authority, meaning that the repeal of the authority to issue orders or regulations normally repeals those orders or regulations already issued. See *United States v. Fortier*, 342 U.S. 160, 161-62 (1951) (per curiam) (holding that repeal of statutory authority to impose price restrictions operated as a repeal of restrictions already in place); *Osborn Funeral Home, Inc. v. La. State Bd. of Embalmers*, 194 So. 2d 185, 188 (La. Ct. App. 1967) ("[T]he

authority purportedly conferred by the former statute upon defendant board to adopt the rules and regulations assailed by plaintiff no longer exists. . . . Therefore, the rules and regulations [of the board] have no basis for their existence and, in fact, no longer exist or have any pertinence."); *In re Brown*, 903 A.2d 147, 151 (R.I. 2006) (holding that repeal of the governor's power to issue orders to place questions on the ballot meant that orders issued prior to the repeal of the governor's authority were no longer binding); *S.C. Dep't of Natural Res. v. McDonald*, 626 S.E.2d 816, 819 (S.C. Ct. App. 2006) ("[T]he question is whether the repeal of . . . the statute referenced during the promulgation . . . operates as a repeal of the regulation itself. We hold that it does."). In accord with this principle, the repeal of the authorization to create health orders removed the authority upon which such orders rested. Holding to the contrary would leave orders in effect that no body save the Legislature itself could modify or eliminate.

¶ 28. Against this backdrop, nothing suggests a legislative intent to leave the orders in place. The Legislature has adopted a general savings clause that creates a designated set of exceptions to the common law rule, in particular for individual rights or liabilities created under the repealed statutory regime. See 1 V.S.A. § 214. The Board of Health orders do not fall within any of the provisions of this general savings clause. Had the Legislature specifically intended to leave prior orders in effect after the 1989 act, it could have communicated this by appending a specific savings clause to the act repealing the Board's authority — something that is conspicuously absent from the act's transition provisions. See *Sumner v. Cummings*, 23 Vt. 427, 433 (1851) ("The legislature, by repealing the statute without any saving of actions pending, have really let the action fall . . . ."); *Hansson v. Ariz. State Bd. of Dental Exam'rs*, 985 P.2d 551, 553-54 (Ariz. Ct. App. 1998) (interpreting the lack of a savings clause or grandfather clause as evidence that the legislature intended to abolish a board's previous authority). The Legislature has availed itself of such savings clauses elsewhere. See, e.g., 19 V.S.A. § 6(b) ("The transportation board is successor to the public service board, the highway board, and the aeronautics board in the regulatory and quasi-judicial functions related to transportation. It may enforce all orders of those boards which remain in effect."). Furthermore, the repeal of the penalty for violating such orders confirms that

the Legislature no longer considered the Board's orders to be a source of prohibitions. We thus conclude that the Legislature's intent in the 1989 changes was to entirely replace the old regulatory scheme — including the old Board of Health orders — with a new permitting scheme. As a result, the 1926 Board of Health order no longer operates to prohibit boating, bathing, or swimming in Berlin Pond.

¶ 29. The City has not directly argued contrary to our conclusion. Instead, it argues that later legislation preserved or restored that order, a subject we address next. The City argues primarily from the 1991 legislation that transferred jurisdiction over public water supplies from the Department of Health to ANR. See 1991, No. 71, §§ 1-1a (describing the act's purpose of transferring jurisdiction over the public water supply program). In the course of this transfer of authority, the Legislature included the following transitional provision: "Existing rules for public water supplies adopted under Title 18 shall remain in effect as rules adopted under 10 V.S.A. chapter 56 until superseded by rules adopted by the secretary of natural resources under this chapter." 1991, No. 71, § 9(a). With regards to the 1926 Board of Health order, the trial court held that "[t]he savings provision left it in force until superseded by the adoption of new rules by ANR."

¶ 30. ANR did promulgate a new set of rules, known collectively as the Water Supply Rule. See Water Supply Rule, 12 Code of Vt. Rules 12 030 003, available at http://www.michie.com/vermont. Section 16 sets forth the rules protecting public water supplies from contamination. The central provision is that public water supplies are required to have a "source protection plan" approved by ANR, the purpose of which is to identify potential sources of contamination in a specific area, known as the "source protection area." See *id.* § 16.1. Both of these terms of art figure into the question of whether the State — in particular ANR — has adopted the 1926 health order.

¶ 31. According to § 16.2.2 of the Water Supply Rule, the source protection area is: "(a) the area approved by the Secretary; (b) the 3,000 foot fixed radius circle assigned by the Secretary prior to September 24, 1992; or (c) the area approved by the Vermont Department of Health prior to July 1, 1991." The trial court concluded that subsection (c) means that "the 1926 Health Board order lives on through its incorporation into the current Water Supply Rule" and that "the 1926 Health Board order remains in effect through its adoption."

¶ 32. This conclusion was incorrect. Subsection (c) of § 16.2.2 includes an additional sentence that reads, "These approvals do not include restrictions imposed by the Board of Health in Health Orders." This sentence was an amendment that came into effect only in December 2010. This language was erroneously overlooked by the trial court apparently because it was added after the court issued its preliminary injunction. The court's findings and analysis for the preliminary injunction became its findings and analysis for the permanent injunction so that the court missed the amendment to the regulation.

¶ 33. There are broader reasons why the 1991 legislation did not have the effect claimed for it. The transitional provision protected "[e]xisting rules." 1991, No. 71, § 9(a). Even if the Board of Health order could be viewed as a "rule," it was not "existing" when the 1991 legislation was enacted. To preserve the 1926 order, there had to be such transitional language in the 1989 legislation, but there was not. By 1991 it was too late.

¶ 34. Moreover, the regulatory regime that replaced the regime in effect in 1926 adopted a different approach. It required a permit to operate a public water system or public water source and regulated the holders of permits. See 18 V.S.A. § 1233(c) (as added by 1989, No. 105, § 1, and repealed by 1991, No. 71, § 7). There is nothing in the legislation to suggest that it gave power to operators, whether private or public, to regulate the activities of persons in or on public water sources.[2] Thus, the rule on which the City relies — § 16.2.2 of the Water Supply Rule — concerns what geographical area will be designated as a source protection area, not what restrictions can be imposed in the area so designated. Thus, even if the 2010 language had not been added to § 16.2.2(c), the regulation would not be a basis to conclude that ANR adopted the 1926 order restrictions.

---

[2] 10 V.S.A. § 1679(e) provides that "[r]ules, standards and criteria" adopted with respect to source protection areas "shall allow for human activity within the watershed of a public water source, provided that such human activity does not constitute a public health hazard or a significant public health risk." There is nothing in the rules implementing this section. We infer that ANR has not found an instance where human activity within the watershed of a public water supply is a public health hazard or a significant public health risk. We need not reach whether this section gives ANR the power to restrict such human activity or to authorize the water supply operator to do so.

¶ 35. This analysis also responds to the City's additional argument that the 1926 order lives on through its source protection plan, if not through the source protection area designation. In 2005, ANR approved the City of Montpelier's source protection plan. The plan includes the following discussion of recreational use and the 1926 order:

> Boating, fishing, and bathing in Berlin Pond and the tributaries within one-half mile of the tributary mouth is prohibited by a State Board of Health order dating back to 1926. Since recreational use is not currently allowed, it has not been identified as an existing PSOC [potential source of contamination]. However, it should be noted that if recreational use is permitted in the future, it will cause a significant risk to water quality. For example, motor boating can have a considerable impact due to the discharge of fuel and oil from inefficient engines. The chemicals and substances associated with motor boating and other recreational activities could have an adverse effect on the water quality of Berlin Pond.

The City argues that "the incorporation of the 1926 Order into the City's Source Protection Plan maintains its vitality as arguably the cornerstone of the Plan itself."

¶ 36. Consistent with our analysis above, we view the plan's language as a statement of what the City believed was the state of the law. Placing that statement in the plan does not make it so. The ANR Water Supply Rule requires public community water systems to have an approved source protection plan. Water Supply Rule § 16.1. That plan has to contain "a management plan for the risks from the potential and actual sources of contamination." *Id.* § 16.2. The plan must be "directed towards controlling existing potential sources of contamination and, where possible, reducing risks of potential contamination." *Id.* § 16.2.5. There is no suggestion, however, that the plan itself gives the operator some special power to regulate the activities of persons who might use source waters for recreation or other purposes. The techniques for management of source waters suggested in the rule are notification of landowners in the source protection area of the existence of the plan, education efforts of various types, purchase of land or conservation easements, creation of buffer zones, and adoption of zoning ordinances. *Id.* None of these support the City's argument.

Perhaps the City might use a restrictive zoning ordinance if the pond were within the territorial limits of the City, but the City has no zoning power over uses in another municipality.

¶ 37. The limits of the public water supply regulatory legislation are understandable because the Legislature created another source of law to regulate activities on the surface of navigable waters. In 1970, the Legislature authorized the Water Resources Board[3] to regulate use of public waters. 1969, No. 281 (Adj. Sess.), § 13 (adopting 10 V.S.A. § 1103, now 10 V.S.A. § 1424). Under the legislation, the successor to the Water Resources Board — the Water Resources Panel of the NRB, 10 V.S.A. § 1422 — can define areas of public waters on which certain uses may be conducted and define the uses in those areas. *Id.* § 1424(a)(1), (2). The Panel shall "attempt to manage the public waters so that the various uses may be enjoyed in a reasonable manner, in the best interests of all the citizens of the state" and "[t]o the extent possible" shall "provide for all normal uses." *Id.* § 1424(c).

¶ 38. The Panel has adopted specific rules for Berlin Pond. See Vermont Water Resources Panel, Vermont Natural Resources Board, Vermont Use of Public Waters Rules, Appendix A, at A-18. Consistent with the general rules, the rules for Berlin Pond restrict the speed of motor boats and prohibit the use of personal watercraft, aircraft (during the summer), and internal combustion motors. *Id.* It does not prohibit boating generally or fishing or swimming. The rules, however, contain a footnote specific to Berlin Pond that provides that "[r]estrictions adopted by authorities other than the Natural Resources Board may also apply — for example, restrictions on recreational uses established by the state or a local board of health to protect public water supplies." *Id.* at A-84. The City argues that this footnote represents recognition by the Panel that the Board of Health order is in effect. Even if the Panel had the power to make the Board of Health order effective, we find the statement equivocal at best. It reflects the existence of this controversy, rather than an opinion on how the controversy should be resolved.

¶ 39. The record reflects that in 2007 the City filed a petition with the Water Resources Panel seeking an amendment to the Berlin Pond rule to prohibit swimming, fishing, and boating. The

---

[3] The Water Resources Board has been replaced in this regulatory scheme by the Water Resources Panel of the NRB. See 10 V.S.A. § 1422(2).

Panel rejected the petition as incomplete, stating that the petition "does not state actual rules that you wish the Panel to promulgate . . . [or] state why a rule change is necessary." For reasons not specified in the record, the City did not correct the defects, and the petition died. Thus, the rules regulating the use of Berlin Pond continue to have no prohibition on the activities in issue in this litigation.

## IV.

¶ 40. Although the State has not itself prohibited recreational use of Berlin Pond, it may have delegated to the City of Montpelier the authority to make such prohibitions. The City's second main argument is in this vein. There are two possible sources of this power: the City's charter and the general statutes.[4] See *Lawton v. Town of Brattleboro*, 128 Vt. 525, 529-30, 266 A.2d 816, 819 (1970); City of Montpelier Charter, 24 V.S.A. App. ch. 5, § 101. The City relies upon the former and contends that, by ratifying the municipal charter and various amendments thereto over time, the Legislature has authorized the City to regulate the use of Berlin Pond.

¶ 41. We discern three possible arguments in favor of such authorization, each deriving from a provision in the current municipal charter: (1) that the current charter provision granting the power to maintain reservoirs, when interpreted in light of the historical charter provisions, should be read to include an authorization to regulate recreational use of Berlin Pond; (2) that the transfer of the Village of Montpelier's rights to the City transfers the authorization for such regulation; and (3) that the City's ordinances are valid under the charter's savings clause as an exercise of power granted under a prior version of the charter. Before addressing these arguments, however, a brief description of the relevant historical revisions in the Montpelier charter is necessary.

## A.

¶ 42. In 1870, the Legislature amended the charter of Montpelier — then a village — authorizing it to "purchase the right to

---

[4] In 2010, the City adopted a specific ordinance on Berlin Pond Protection as ordinance 13.3. Unless authorized by the charter or a state statute, the ordinance alone cannot give the City the power to regulate usage of Berlin Pond.

take water from the outlet of Berlin pond." 1870, No. 240, § 1. Fourteen years later in 1884, the Legislature amended Montpelier's charter to create a board of water commissioners. 1884, No. 212, § 1. The Legislature granted this board power to "enter upon any land adjoining Berlin pond or adjoining the reservoir, from which water is taken to the village of Montpelier," *id.* § 3, and empowered it "to commence such legal proceedings, either at law or in equity, in the name of, and for the benefit of said village, as shall prevent any person or persons from adulterating the waters of said reservoir, stream or pond, or rendering the waters thereof unfit for domestic use," *id.* § 4.

¶ 43. Ten years later, the City of Montpelier was incorporated when the town and village merged. See 1894, No. 166, § 1. In addition to preserving rights granted to the village, the 1894 charter specifically granted the city council the power "[t]o make all regulations and ordinances for preventing the corruption and for the protection of the water supply of the said city and for the protection from injury of any dam, reservoir, aqueduct, pipe, hydrant, or source of supply of water connected with any water plant now owned or hereafter acquired by said city." *Id.* § 21(25). The charter also granted the power "[t]o provide a supply of water for the protection of the city against fire and for other purposes, and to regulate the use of the same; and to establish and maintain reservoirs, aqueducts, water pipes, hydrants or any other apparatus necessary for such purposes, upon, in and through the lands of individuals and corporations, on making compensation therefor . . . ." *Id.* § 21(24). In 1900, the Legislature further added that the City "may construct and maintain such aqueducts and reservoirs as they may judge best." 1900, No. 162, § 2. These provisions were all retained in almost exactly this form until 1975. See, e.g., 1955, No. 329, Title III, § 17.

¶ 44. The current version of the City's charter comes largely from a comprehensive revision that was approved by a voter referendum in 1974 and validated by the General Assembly in 1975. This revision largely eliminated the previous language. The relevant current provision is the clause in the "General powers" section that states: "Such corporation . . . may acquire, construct, and maintain such dams, aqueducts, reservoirs, and sewage disposal facilities as it may deem necessary for the benefit of the city." 24 V.S.A. App. ch. 5, § 102. Two other clauses in the current charter also have indirect significance by potentially keeping alive

prior grants of power. One clause in the charter — an updated version of the same language present in the 1894 incorporation — transfers to the City of Montpelier the rights of the former Village of Montpelier. *Id.* § 1406. Second, a saving clause exists, which ensures that ordinances lawfully established under previous versions of the charter remain valid. *Id.* § 1402.

## B.

¶ 45. The first question is whether the current charter's grant of power to "acquire, construct, and maintain such . . . reservoirs . . . as it may deem necessary for the benefit of the city" includes the power to regulate boating, fishing, and swimming on Berlin Pond. We conclude that it does not.

¶ 46. To begin with, Dillon's Rule creates a presumption against finding a grant of power to the municipality. *E.B. & A.C. Whiting Co.*, 106 Vt. at 461, 175 A. at 42 ("The general rule is that the charter of a municipal corporation is to be strictly construed against it; the presumption being that the Legislature granted in clear and unmistakable terms all that it intended to grant."); see also *Valcour*, 104 Vt. at 130, 158 A. at 86 ("[I]f any fair, reasonable, substantial doubt exists concerning [a grant of power,] it must be resolved against the [municipality], and its power denied."). This is especially true where the power in question would enable a municipality to restrict access to the public's natural resources. The Constitution affords citizens a right "to fish in all boatable and other waters (not private property) under proper regulations, to be made and provided by the General Assembly." Vt. Const. ch. II, § 67; cf. also 10 V.S.A. § 1679(e) (creating a defeasible presumption that ANR rules for water use shall "allow for human activity within the watershed of a public water source"). Although this right is far from absolute, it is not so infirm as to permit regulation where there is not a clear authorization from the Legislature.

¶ 47. Second, the language employed is essentially the same as that applicable to any municipality under 24 V.S.A. § 3301 ("A municipal corporation is hereby authorized and empowered to construct, maintain, and repair . . . [a] reservoir . . . ."). Thus, there is nothing unique or special about the charter language that suggests that Montpelier has a power unavailable to every other municipality in Vermont.

464

¶ 48. Most importantly, the language is far from an unambiguous authorization to regulate uses of Berlin Pond by others. We would stretch the meaning of "maintain" beyond any reasonable limits to hold that the word includes the power to regulate the actions of others. The word connotes merely keeping something, and insofar as it involves action, it connotes taking positive steps to keep something in good condition — as one would by engaging in routine repairs or upkeep. See, e.g., Oxford English Dictionary (3d ed. 2010) ("To pay for the upkeep of; to keep (a ship, garrison, etc.) supplied or equipped; to keep (a light) burning by supply of fuel; to keep (a road, a building, etc.) in repair; to take action to preserve (a machine, etc.) in working order.").

■■■ ¶ 49. Moreover, it would be an equally long stretch to call Berlin Pond a "reservoir" for the City of Montpelier. As discussed above, the City has the right to take water from Berlin Pond; it does not own Berlin Pond. Whether used to refer to a man-made facility or a natural body of water, the word "reservoir" means a place in which water is stored. Compare id. ("A lake or large pool, natural or man-made, used to store water for public and industrial use, for irrigation, etc."), with Webster's Third New International Dictionary (2002) ("a place where water is collected and kept in quantity for use when wanted; esp: an artificial lake in which water is impounded for domestic and industrial use, irrigation, hydroelectric power, flood control, or other purposes"). Nothing in the record indicates that the City has a right to store water in Berlin Pond. Consistent with the understanding that Berlin Pond is not the City's reservoir, earlier versions of the charter were explicit in distinguishing Berlin Pond from the reservoir where water is stored. See 1884, No. 212, § 3 (authorizing the water board to enter upon "any land adjoining Berlin pond or adjoining the reservoir, from which water is taken to the village of Montpelier, or adjoining the stream connecting said reservoir with Berlin pond"). The 1926 Board of Health order was also explicit on this point because it prohibited "boating, fishing and bathing in the waters of Berlin Pond, . . . of the outlet of Berlin Pond to the Montpelier Reservoir, and of the Montpelier Reservoir."[5]

---

[5] It is not clear whether there currently is a Montpelier reservoir. In its preliminary judgment ruling, the superior court found that "[t]here is no 'back-up' reservoir or municipal well," although this may be a reference to source rather than to storage.

¶ 50. We recognize that the settled law grants a municipality such implied powers as are necessary to exercise the explicitly granted powers. "The powers of a municipal corporation include both those powers granted in express words by statute and those powers necessarily or fairly implied in the powers expressly granted." *Gade v. Chittenden Solid Waste Dist.*, 2009 VT 107, ¶ 13, 187 Vt. 7, 989 A.2d 491; see also *Hunters, Anglers & Trappers Ass'n of Vt.*, 2006 VT 82, ¶ 23 (Burgess, J., concurring) ("Dillon's Rule not only limits municipalities to 'those powers and functions specifically authorized by the legislature' as argued by plaintiff in this instance, but is also authority for the implied 'additional functions as may be incident, subordinate or necessary to the exercise' of such express powers by the municipality." (quoting *Hinesburg Sand & Gravel Co.*, 135 Vt. at 486, 380 A.2d at 66)). Thus, even if the regulation of recreational use of a public water supply is not within the meaning of "maintain . . . reservoirs," it may be a power implied by, or incident to, or necessary to, the authorized power.

¶ 51. This is not, however, the case here. Our analysis above reaches the conclusion that the power to regulate recreational use cannot be found in the general power whether directly or by implication. Nor could we find that the regulation power is somehow incidental to the power specified in the charter. This leaves only the argument that the power to regulate recreational uses is necessary for Montpelier to maintain a reservoir or more generally to use Berlin Pond as its water supply. Although witnesses for the City testified to why the City wants to prohibit swimming, boating, and fishing in Berlin Pond, they did not try to prove, and the superior court did not find, that the prohibition was necessary for Berlin Pond to be used as a water supply. Indeed, the Vermont Water Quality Standards on which defendants rely seems to be a complete answer to such a claim because it provides that use of a source for public water supply is compatible with the recreational uses in issue here.[6] Vermont Water Quality Standards § 3-03(A)(3), (4). We have answered above that we do not believe that the City's permit to operate its

---

[6] In fact, the water quality could meet only a lower standard, called Class B, and be "acceptable for public water supply with filtration and disinfection." 10 V.S.A. § 1252(a). That classification is "[s]uitable for bathing and recreation." *Id.*

public water system is dependent on it prohibiting the recreational uses of Berlin Pond. Further, the City has the option of initiating state rulemaking by filing a request with the Water Resources Panel.[7] As discussed above, the City started this process, but did not complete it. To the extent that the City did not go through with the process under the mistaken belief that the 1926 Board of Health order is still in effect, this decision removes that misconception.

¶ 52. Before concluding our analysis of whether the current charter authorizes the City to prohibit swimming, boating, and fishing in Berlin Pond, we must address one additional argument from the City. The City argues that however it is worded, the relevant charter provision must be interpreted as the continuation of a long line of charter provisions concerning the City's water supply. According to this argument, the current charter's grant of power to "maintain . . . reservoirs" is but the most recent incarnation of a longstanding regulatory authorization. Thus, the current power to "maintain reservoirs" should be read as the extension of previous language: the 1884 authorization for "such legal proceedings . . . as shall prevent any person or persons from adulterating the waters of said reservoir, stream or pond, or rendering the waters thereof unfit for domestic use," 1884, No. 212, § 4; the 1894 authorization "[t]o make all regulations and ordinances for preventing the corruption and for the protection of the water supply of the said city," 1894, No. 166, § 21(25); and the slightly amended 1955 authorization "[t]o make and enforce all regulations and ordinances for preventing the corruption of and for the protection of the water supply of the City," 1955, No. 329, Title III, § 17(XXXVIII). The City's argument is that the current provision is the most recent iteration of these older provisions — which were supplanted over time in the process of comprehensive revision — and carries the same general legislative intent.

¶ 53. Although the revised charter is a continuation of the previous charters, see 24 V.S.A. App. ch. 5, § 1408 ("The

---

[7] Initiating rulemaking at the state level would not be a form of delegated authority. The Panel can delegate authority to regulate usage of public waters to a municipality but only if the municipality "is adjacent to or . . . contains the water." 10 V.S.A. § 1424(f). The City does not meet these requirements with respect to Berlin Pond.

provisions of this act, so far as they are the same as those of acts hereby amended, shall be construed as a continuation of such acts, and not as new enactments."), we reject the contention that the relevant history here can wholly transfigure the current charter provision. Although a history of predecessor provisions can provide useful insight into legislative intent, it can cut in both directions. Where current language replaces older language as part of a revision, the older language can suggest a meaning that was supposed to be preserved, or it can provide a contrast and thereby suggest a difference in meaning. Compare *Town of Cambridge v. Town of Underhill*, 124 Vt. 237, 240, 204 A.2d 155, 157 (1964) ("When changes . . . come about only as a result of a revision, caution is required in determining whether or not any substantive change in the law was intended."), with *Diamond v. Vickrey*, 134 Vt. 585, 589, 367 A.2d 668, 671 (1976) ("It is well settled that, in interpreting amendatory language in a statute, we are guided by the rule that the Legislature intended to change the law."). Thus, a phrase or clause will not automatically inherit the meaning of substantially more elaborate or explicit language that has been supplanted. Here, the phrase "maintain . . . reservoirs" cannot plausibly be considered as merely clarifying or updating the far more explicit authorization "[t]o make and enforce all regulations and ordinances for preventing the corruption of and for the protection of the water supply of the City." See *State v. Thompson*, 174 Vt. 172, 178, 807 A.2d 454, 460 (2002) ("We presume that the Legislature intended to change the meaning of a statute when it amends it, but we will recognize clarification of the law where the circumstances clearly indicate it was intended."). This is especially clear because the "maintain . . . reservoirs" language was always present alongside the authorization "[t]o make and enforce all regulations and ordinances for preventing the corruption of and for the protection of the water supply of the City," and the latter provision was simply removed. Compare 24 V.S.A. App. ch. 5, § 102, with 1955, No. 329, Title III, § 17(XXXVIII). Therefore, insofar as it provides any guidance here, the history of the charter revisions actually confirms the conclusion that the City's power to maintain reservoirs does not include the power to regulate recreational use of Berlin Pond.

¶ 54. For the above reasons, we hold that the current charter language does not empower the City to prohibit boating,

fishing, or swimming in Berlin Pond.[8]

## C.

¶ 55. Having concluded that the present municipal charter language does not directly include the power to regulate the recreational use of Berlin Pond, it remains to be seen whether it might nonetheless preserve the previously granted powers and thereby indirectly include the powers in question. Two significant clauses in the City's charter — the transfer clause and the savings clause — retain authority from prior charters. We conclude, however, that neither source of residual authority can ground the City's prohibitions on recreational activities.

---

[8] Although this is a complete answer to the issue under the current charter, there is an additional reason why the City cannot prohibit fishing. The Legislature has made a clear statement that municipalities are not generally authorized to regulate fishing. Title 24, § 2295 states:

> Except as otherwise provided by law, no town, city or incorporated village, by ordinance, resolution or other enactment, shall directly regulate hunting, fishing and trapping or the possession, ownership, transportation, transfer, sale, purchase, carrying, licensing or registration of traps, firearms, ammunition or components of firearms or ammunition. . . . The provisions of this section shall supersede any inconsistent provisions of a municipal charter.

This statute makes clear that a municipal charter cannot be the source of authority to regulate fishing. If Montpelier has the authority to prohibit fishing, the source must be found in the statutory phrase, "[e]xcept as otherwise provided by law." The only possible source appears to be 10 V.S.A. § 5201(a). See *Hunters, Anglers & Trappers Ass'n of Vt.*, 2006 VT 82, ¶¶ 9-13. This statute allows an "owner, or a person having the exclusive right to take fish . . . upon land or the waters thereon" to post that fishing is prohibited. In *Hunters, Anglers & Trappers Ass'n of Vermont* this Court held that a municipality that owned land could post it against hunting under § 5201(a) despite the prohibition of 24 V.S.A. § 2295. 2006 VT 82, ¶¶ 9-13. That holding does not control here. As we have noted in the text, the City is not the owner of Berlin Pond. There is nothing in the record that suggests that the City has the exclusive right to take fish from Berlin Pond. Under these circumstances 10 V.S.A. § 5201(a) does not apply and, therefore, the limitation on the City imposed by 24 V.S.A. § 2295 does apply.

The City addressed this point in a rebuttal brief and does not appear to contest it. The brief quotes a statement made by its counsel at the hearing: "Again, nothing in this case has involved a City attempt to regulate hunting or fishing directly; it's access that's prohibited." The point is that the City prohibits fishing only by preventing access to the pond over its lands.

¶ 56. The transfer clause preserves in the City the previously existing rights and privileges of the Village of Montpelier. In existence since 1894, it reads, "All rights, privileges, and franchises heretofore granted to the Village of Montpelier, by any act of the legislature, or existing under any law, or by virtue of any contract relating to the water works formerly possessed by said village, [are][9] hereby confirmed under the City of Montpelier." 24 V.S.A. App. ch. 5, § 1406. This transfer clause appears to convey to the City of Montpelier those rights that were granted to the village, which would include those powers concerning Berlin Pond contained in the 1870 and 1884 charter amendments. See *ante*, ¶¶ 42-43. These amendments allowed the village to purchase the right to take water from Berlin Pond, and they created a village water board, which was entitled to enter on the lands surrounding Berlin Pond and initiate legal proceedings to protect the village water supply against adulteration.[10] See 1884, No. 212; 1870, No. 240, § 1.

¶ 57. Even if all of the village's powers are now vested in the City, they are nonetheless insufficient to support the City's regulations at issue in this case. The first of these powers — the authorization to purchase the right to take water from Berlin Pond — cannot be the basis for the City's authority to regulate other users of Berlin Pond. Nor does the power to inspect Berlin Pond and initiate legal actions to protect its water supply constitute the power to regulate the pond's use by others. Certainly, the power to inspect the pond does not bring with it the power to regulate uses of the pond. Probably, the most support the City can find is in the village power to bring suits to

---

[9] The Vermont Statutes Annotated has "and" here — as do the versions available online from the Legislature and the City — leaving the sentence as not a sentence. This appears to be a transcription error as the first appearance of this language in the 1894 incorporation of Montpelier as a city uses "are" as do more recent revisions. See 1955, No. 329, Title XVI, § 7; 1894, No. 166, § 1.

[10] A weakness of the City's argument is that the water board no longer exists. The City asserts that the water board is now the city council, but we find no evidence that this is the case. On the contrary, it appears that the water board ceased to exist when Montpelier was incorporated as a city in 1894. While this coincides with the creation of the city council, it does not follow from the transfer clause that the city council inherited the powers of the water board. The transfer clause asserts that the rights and privileges of the village transfer to the City; it does not assert that the rights and privileges of obsolete village officers transfer to the new city council. Despite this weakness, we will assume that the powers of the water board can be exercised in some way by the City under the transfer clause.

"prevent any person or persons from adulterating the waters of said reservoir, stream or pond, or rendering the waters thereof unfit for domestic use." 1884, No. 212, § 4. We cannot conclude, however, the power to bring lawsuits includes the power to create prophylactic regulations, like those in issue here. If the City believes that a user is rendering the water unfit for public water supply purposes or is adulterating the water, the section authorizes litigation to stop the conduct. It does not authorize a broad prohibition on all conduct that might, in extreme cases, lead to adulteration or unfit water.

¶ 58. We also conclude that appeal to the savings clause is ultimately unavailing. The savings clause — part of the 1975 revisions — states:

> The passage of this act shall not affect any ordinance, resolution, or by-law lawfully enacted, ordained, and established under the provisions of the acts hereby amended by this act, and not inconsistent with the provisions of this act, but the same shall be and remain in full force and effect until repealed, altered, or amended.

24 V.S.A. App. ch. 5, § 1402. This is significant here because both ordinances on which the City relies, § 3-332 — which makes it a crime to pollute, bathe, or fish in a public reservoir — and § 13-1 — which makes it illegal to trespass upon or injure a public resource controlled by the City, were enacted prior to the 1975 revisions of the charter.[11] See Montpelier, Vt., Code of Ordinances § 3-332 (enacted 1970); id. § 13-1 (enacted 1972). As a result, these ordinances were passed when the municipal charter still contained the authorization "[t]o make and enforce all regulations and ordinances for preventing the corruption of and for the protection of the water supply of the City." See 1955, No. 329, Title III, § 17(XXXVIII). Even if the current charter language does not presently authorize the City to make regulations governing the use of Berlin Pond, the existing ordinances may have been valid as exercises of the power "[t]o make and enforce all regulations and ordinances for preventing the corruption of and for the

---

[11] The City added specific protections for Berlin Pond in § 13.3 in 2010. This ordinance provision was enacted after the adoption of the current charter and is not protected by the savings clause.

protection of the water supply," and may continue to prohibit the defendants' proposed conduct.

¶ 59. The difficulty with this argument is that we cannot conclude that the ordinances protected by the savings clause prohibit the recreational use of Berlin Pond. Ordinance 3-332 purports in part to control activities on a "public reservoir." As discussed above, we cannot find Berlin Pond to be a Montpelier public reservoir. Further, as defendants argue, § 3-332 does not explicitly forbid boating.[12] The City counters that boating and fishing are prohibited indirectly because they involve trespass upon a City resource in violation of § 13-1. To the extent that the City means trespass on the land surrounding Berlin Pond owned by the City, we agree with the City's point. To the extent that the City is arguing that the trespass is on Berlin Pond itself, we cannot agree. Under § 13-1, the public resource must be "owned by or under the control of the City of Montpelier." As we have said on multiple occasions in this decision, the City does not own Berlin Pond; it has only a right to take water from it. Thus, to agree with the City's claim, we must find that Berlin Pond is under the control of the City of Montpelier. As a matter of state law, this claim is unsupported. As we discussed above, the usage of the surface waters of Berlin Pond is under the control of the Water Resources Panel of the Natural Resources Board. It is also unsupported under the current charter as we have also discussed above, even though it may have been supported by the former charter. The savings clause assures that § 13-1 continues to be valid law, not that resources controlled by the City at the time the ordinance was passed continue to be so controlled.

¶ 60. The same conclusion is also dictated by the limitation on the savings clause to saving only those ordinances that are "not inconsistent with" the current charter. 24 V.S.A. App. ch. 5, § 1402. Given our conclusion that the current charter does not grant the City the power to regulate the usage of Berlin Pond, see *supra*, part IV.B., we conclude that the City's ordinances are inconsistent with the current charter insofar as they are interpreted to regulate use of Berlin Pond. This understanding of "inconsistent" is derived from Dillon's Rule. Nothing in the

---

[12] Defendants also attack the fishing prohibition under 24 V.S.A. § 2295. As discussed *supra*, n.8, we agree that the fishing prohibition violates 24 V.S.A. § 2295, a point the City apparently concedes.

charter directly prevents or forbids the regulation of Berlin Pond. In this sense, ordinances are not inconsistent with the charter — there is no contradiction between the two. Under Dillon's Rule, however, a municipal charter is to be read as an exclusive list of enumerated powers. See *Welch v. Town of Ludlow*, 136 Vt. 83, 87, 385 A.2d 1105, 1108 (1978) ("In Vermont, where we have no home rule constitutional provision, a town has only those powers specifically authorized by the Legislature."). In this light, the City's ordinances as applied to recreational use of Berlin Pond are inconsistent with the City's current charter because they involve the exercise of a power that is not enumerated therein.

¶ 61. For these reasons, neither the transfer clause nor the savings clause can resuscitate sufficient grants of power to authorize the City to regulate the use of Berlin Pond by others. Assuming — without deciding — that the City was historically granted the power to make such regulations as would preserve the pond from contamination, that grant of power no longer exists to support the application of the City's present ordinances to regulate recreational use of Berlin Pond.

¶ 62. In summary we hold that the City of Montpelier does not have the power under its charter to prohibit swimming, fishing, or boating on Berlin Pond. Since the City does not have such power under state law or under the charter, the decision of the superior court enjoining these recreational activities was in error.

## V.

¶ 63. Although the above discussion answers all the issues raised on appeal by defendants, we comment upon one remaining issue. The City filed a rebuttal brief which appears to claim that the City's real power to protect the quality of the water in Berlin Pond lies in its ability to prevent trespass on the lands surrounding the pond. As we stated earlier, the City owns almost all of the land surrounding Berlin Pond. Although defendants claimed at trial that they intended to reach Berlin Pond over the land owned by the Town of Berlin, the superior court issued an injunction against trespassing on the land owned by the City. In defendants' docketing statement on appeal, they suggested that "Montpelier has no authority to enact ordinances that are enforceable beyond its boundaries." The City, in response, framed the question as

whether it was "authorized to regulate public access to and use of its potable water supply." Defendants' brief, however, never addressed the portion of the injunction concerning trespass and accordingly its validity is not before us. See V.R.A.P. 28(a)(1) (requiring appellant's brief to contain a statement of "the issues presented for review"). As a result, this portion of the City's protection of Berlin Pond remains intact.

¶ 64. The disposition of this case leaves a state of affairs that admittedly represents an awkward intermediate result. The City may strive to prevent indirectly the recreational use of Berlin Pond by denying access to its lands that surround the pond, but it may not directly regulate use of the pond itself. This may be unsatisfactory to the City, which the trial court found faced the possibility of irreparable harm from recreational use of the pond. However, "[n]o arguments drawn from convenience can confer upon the corporation powers not granted. If more powers are needed more must be asked for." *Hutchinson v. Pratt*, 11 Vt. 402, 413 (1839). Our decision reflects the fact that, under the laws of this state, the recreational use of Berlin Pond is a matter of state concern requiring a resolution at the state level. See Sax, *supra*, at 560 ("Frequently [in public trust cases], judicial intervention takes the special form of moving decisional authority from one constituency to another. In taking such action, a court might hold, for example, that a matter is of state-wide interest and must be approved by the state legislature, rather than by a municipal or county agency."). Accordingly, our decision places the ultimate resolution of this matter with the state government. Cf. *Cent. Vt. Ry.*, 153 Vt. at 346, 571 A.2d at 1132 ("[T]he state's power to supervise trust property in perpetuity is coupled with the ineluctable duty to exercise this power."). We determine only that the City's current powers are limited to preventing trespass upon its property.

*The judgment enjoining defendants "from boating, fishing, and swimming in Berlin Pond" is reversed.*